## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

F45 TRAINING PTY LTD. and §
F45 TRAINING INC., §
§
    *Plaintiffs*, §
§
    v. §          Civil Action No. 20-1194-WCB
§
BODY FIT TRAINING USA INC. and §       **FILED UNDER SEAL**
BFT FRANCHISE HOLDINGS LLC, §
§
    *Defendants*. §

## <u>MEMORANDUM OPINION AND ORDER</u>

In this patent infringement action, defendants Body Fit Training USA Inc. and BFT Franchise Holdings LLC (collectively, "BFT") have moved for summary judgment on two grounds. First, they contend that the claims asserted against them are directed to patent-ineligible subject matter. Second, they contend that they are entitled to summary judgment of non-infringement on each of the asserted claims. Dkt. No. 181. I held oral argument on the defendants' motion on November 9, 2022. For the reasons set forth below, the motion for summary judgment of invalidity under 35 U.S.C. § 101 is GRANTED, and the motion for summary judgment of non-infringement is GRANTED IN PART and DENIED IN PART.

### I.    <u>Background</u>

#### A.  The '890 Patent

Plaintiff F45 Training Pty Ltd. is the owner of U.S. Patent No. 10,143,890 ("the '890 patent"), which is directed to methods of remotely configuring and directing the operation of a fitness studio from a central server. F45 Training Pty Ltd. and its co-plaintiff, F45 Training Inc., (collectively, "F45") assert that BFT infringes claims 1 through 4 and 6 of the '890 patent.

Claim 1 of the '890 patent recites the following:

1.   A computer implemented method for configuring and operating one or more fitness studios each comprising a plurality of exercise stations at which users perform associated exercise routines, each exercise station having an associated display, the method comprising, the steps of:

periodically retrieving, by a server from a database, a studio information program file for a particular studio for a specified period, from a pre-prepared multi-period fitness library comprising a succession of studio information program files, wherein the studio information program file that is retrieved for a current period is different from a studio information program file that was retrieved for a previous period, thereby providing periodic variation of exercise programs;

communicating, by the server to a studio computer associated with the particular studio, the retrieved studio information program file over a communications network;

receiving, by the studio computer, the communicated studio information program file;

periodically physically redistributing the exercise stations within the fitness studio dependent upon the received studio information program file; and

communicating, by the studio computer to the exercise station displays, dependent upon the received studio information program file, station directions to users exercising at the stations for performing an exercise.

Claim 2 depends from claim 1 and adds the steps of "constructing studio information program files for multiple periods; indexing the studio information program files with specified corresponding dates; and storing the studio information program files in the multi-period fitness library in the database."

Claim 3 of the '890 patent recites a method similar to that recited in claim 1:

3.   A computer implemented method for configuring and operating a fitness studio comprising a plurality of exercise stations at which users perform associated exercise routines, each exercise station having an associated display, the method comprising the steps of:

periodically receiving, by a studio computer, studio specific studio information for a specified period, from a pre-prepared multi-period fitness library comprising a succession of studio information program files, wherein the studio

2

information program file that is retrieved for the specified period is different from a studio information program file that was retrieved for a previous period, thereby providing periodic variation of exercise programs, the library stored on a server database;

  periodically physically redistributing the exercise stations within the fitness studio dependent upon the received studio information program file; and

  communicating, by the studio computer to the exercise station displays, dependent upon the received studio information program file, station directions for users exercising at the stations for performing an exercise.

Claim 4 depends from claim 3 and adds that the studio information program file for a specified period comprises one or more of "a physical layout of the stations and any associated exercise equipment; video files demonstrating exercises to be performed at the stations; and exercise parameters for directing users of the stations for performing associated exercises."

Claim 6 depends from claim 4 and recites as follows:

6.  A method according to claim 4, wherein the exercise parameters comprise one or more of:

  a duration parameter specifying a duration for performance of an exercise;

  a repetition parameter specifying a number of repetitions for performing the exercise;

  a rest parameter specifying a rest duration between repetitions; and

  an instruction directing a user of the station to another station when all exercise repetitions at the station are completed.

Stripped of excess verbiage, the claims can fairly be summarized as follows:

The preamble for all five asserted claims recites a computer-implemented method for operating fitness studios.

Claim 1 contains five limitations, four of which are directed to interactions between the server, the studio computer, and the displays located at the exercise stations in the studio.  The server retrieves a program file for a particular studio from a library of such files and sends that file

to the studio computer, which receives it.  Based on the information in the program file, the studio computer sends information to each exercise station display, which in turn directs users in performing the exercises.  The fifth limitation recites that exercise stations are periodically redistributed within the exercise studio depending on information in the program file.

Claim 2 adds to claim 1 that the program files are prepared for multiple periods, indexed by date, and stored in the fitness library.

Claim 3 is directed entirely to activities at the fitness studio.  It recites that the studio computer receives program files from the fitness library that differ from files received for a previous period.  As in claim 1, the remaining two limitations provide for the periodic redistribution of exercise stations and the communication of user instructions to the displays at the exercise stations.

Claim 4 adds that the program file for a specific period comprises one or more of a physical layout of the exercise stations and equipment, video files demonstrating the exercises, and exercise parameters for performing the exercises at each exercise station.

Claim 6 adds that the exercise parameters referred to in claim 4 specify one or more of the following: (1) the duration of the exercises, (2) the number of repetitions, (3) the rest time between exercises, and (4) the next set of exercises for the user to undertake.

### B.  BFT's Accused System

BFT is a global brand of fitness gyms that has two franchises in the United States.  One franchise is located in Fort Lauderdale, Florida, and the other is located in Santa Monica, California.  BFT has other franchises located internationally, including many in Australia.

At the BFT studios, the exercise routines and stations vary on a daily basis.  Each day, all BFT studios receive a file, called a ".BFT file," from an Australian entity, Body Fit Training

Company Pty Ltd. ("BFT Australia").  The .BFT file for a given day includes information such as what exercises the users of the equipment should complete during that day's workout, the number of repetitions for each exercise, and the rest times between exercises.  F45 argues that BFT's system for operating its fitness studios, including the use of .BFT files, infringes the claims of the '890 patent.

### C.  Prior Proceedings in this Case

At the outset of this case, BFT moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that the claims were unpatentable under 35 U.S.C. § 101.  Judge Stark, to whom the case was assigned at that time, applied the two-part test for patentability set forth by the Supreme Court in *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).  Dkt. No. 50 at 3–4, 6.  Applying the first step, which requires the court to "determine whether the claim[] at issue [is] directed to a patent-ineligible concept," *Alice*, 573 U.S. at 218, Judge Stark found that claim 1 of the '890 patent was "directed to the abstract idea of storing, sending, and retrieving information over a network."  Dkt. No. 50 at 3–4.  Because he found that the claim was directed to an abstract idea, he concluded that it was necessary to proceed to the second step of *Alice*, which requires the court to determine whether the claim has elements that, "both individually and 'as an ordered combination,'" contain an "inventive concept" sufficient to "'transform the nature of the claim' into a patent-eligible application" of the abstract idea.  *Alice*, 573 U.S. at 217–18 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys*, 566 U.S. 66, 78 (2012)); *Two-Way Media Ltd v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017).

As to that step, Judge Stark stated that at the motion to dismiss stage he was unable to conclusively determine whether F45's claims contained such elements.  He noted that F45 had pleaded facts that would suggest there might be an unconventional combination of elements that

allows fitness studios to be more accessible to lay clientele. Dkt. No. 50 at 6. For that reason, Judge Stark denied BFT's motion to dismiss. Nonetheless, he left open the possibility that BFT could establish on summary judgment that the '890 patent recites no such transformative elements. BFT has now filed a summary judgment motion on patent ineligibility and noninfringement. Dkt. No. 181.

## II.   Patent Eligibility Under 35 U.S.C § 101

### A.   Principles

Section 101 of the Patent Act defines patent-eligible subject matter. It states: "Whoever invents or discovers any new and useful process, machine, manufacture or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has interpreted that provision to carve out exceptions to that broad characterization of patentable subject matter for "laws of nature, natural phenomena, and abstract ideas." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013).

The framework for determining whether a patent is directed to an unpatentable abstract idea is well settled. The Supreme Court's decision in *Alice* established the now-familiar two-step test for patentability in that context. The first step entails determining whether the claim at issue is directed to an "abstract idea." The second step involves determining whether the claim contains an "inventive concept" that removes the claimed subject matter from the realm of abstraction. *Alice*, 573 U.S. at 218.

#### 1.   Abstract Idea

Neither the Supreme Court nor the Federal Circuit has ventured a single, comprehensive definition of an "abstract idea." *See id.* at 221 ("[W]e need not labor to delimit the precise contours

6

of the 'abstract ideas' category in this case."); *Bilski v. Kappos*, 561 U.S. 593, 621 (Stevens, J., concurring in the judgment) ("The Court . . . never provides a satisfying account of what constitutes an abstract idea."); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2018); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016) ("The Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice* inquiry . . . ."). Rather than a unitary test, what has emerged from cases applying section 101 is a group of related principles that can be applied in gauging whether or not a patent claim is directed to an abstract idea. Those general principles that most directly apply to this case are the following:

First, the courts have characterized "method[s] of organizing human activity" as abstract. *See Alice*, 573 U.S. at 220; *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1285 (Fed. Cir. 2018). For example, the courts have identified fundamental economic and business practices as abstract ideas. *See Elec. Power Grp.*, 830 F.3d at 1353 ("We need not define the outer limits of 'abstract idea . . . .'"); *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018); *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016); *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1261–62 (Fed. Cir. 2016). Such business practices can include relatively specific functions such as disseminating regionally broadcasted content to users outside the region, *see Affinity Labs*, 838 F.3d at 1261–62, classifying an image and storing the image based on its classification, *see In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016), or managing a bingo game, *see Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 (Fed. Cir. 2014).

Applying that principle to patents that claim the use of computers in performing particular activities, the courts have held that simply implementing particular economic practices on a

7

computer does not make those practices patent-eligible. *See BSG Tech*, 899 F.3d at 1285 ("If a claimed invention only performs an abstract idea on a generic computer, the invention is directed to an abstract idea at step one" of *Alice*.). Nor does the fact that a computer can perform such operations more rapidly and efficiently make an abstract idea any less abstract or any more patent-eligible. *See, e.g.*, *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1361 (Fed. Cir. 2020) ("Claiming the improved speed or efficiency inherent with applying the abstract idea on a computer is insufficient to render the claims patent eligible as an improvement to computer functionality." (cleaned up)); *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016); *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016); *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) ("Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis.").

Second, again as applied to computer applications, the courts have looked to whether the claim in question is directed to an improvement in computer technology as opposed to simply providing for the use of a computer to perform "economic or other tasks for which a computer is used in its ordinary capacity." *Enfish*, 822 F.3d at 1336. Where the claims at issue provide for an improvement in the operation of a computer, such as a new memory system, a new type of virus scan, or a new type of interface that makes a computer function more accessible, the Federal Circuit has found the claims patent-eligible. *See Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007–11 (Fed. Cir. 2018) (methods for making electronic spreadsheets more accessible); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361–63 (Fed. Cir. 2018) (improved

display devices); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303–06 (Fed. Cir. 2018) (novel method of virus scanning); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258–60 (Fed. Cir. 2017) (improved computer memory system).

Numerous Federal Circuit decisions have drawn the distinction between patent-eligible claims that "are directed to a specific improvement in the capabilities of computing devices," as opposed to "a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Core Wireless*, 880 F.3d at 1361–62 (quoting *Enfish*, 822 F.3d at 1336); *see also Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1357 (Fed. Cir. 2021); *Yu v. Apple Inc.*, 1 F.4th 1040, 1044 (Fed. Cir. 2021); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016).

Third, in determining whether a particular claim is directed to an abstract idea, the Federal Circuit has focused on whether the claim is purely functional in nature or is sufficiently concrete or specific to be directed to a patent-eligible process rather than a patent-ineligible result. For example, in *SAP America*, 898 F.3d at 1167, the court asked whether the claim had "the specificity required to transform [it] from one claiming only a result to one claiming a way of achieving it." To answer that question, the Federal Circuit has directed courts to "look to whether the claims focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery." *Two-Way Media*, 874 F.3d at 1337; *McRO*, 837 F.3d at 1314 ("We . . . look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery.").

Fourth, as the Supreme Court has explained, "the concern that drives" the judicial exceptions to patentability is "one of preemption." *Alice*, 573 U.S. at 216; *see also ChargePoint,*

*Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015).  The Federal Circuit has elaborated on that point in a manner that is applicable here:

> We have explained that claims for methods that "improve[] an existing technological process" include an inventive concept at step two.  *BASCOM*, 827 F.3d at 1350–51 (quoting *Alice*, 573 U.S. at 221, 223).  And claims that "recite a specific, discrete implementation of the abstract idea" rather than "preempt[ing] all ways of" achieving an abstract idea using a computer may include an inventive concept.  *Id.* at 1350.  But claims to "an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using generic computer concepts in a conventional way" do not pass muster at step two.  *Id.* at 1352.

*In re Killian*, 45 F.4th 1373, 1382–83 (Fed. Cir. 2022) (cleaned up).  In determining whether a particular invention is directed to an abstract idea, it is therefore important to ask whether according patent protection to the claimed subject matter would have a broad preemptive effect on future innovation in the same field.  *See Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013).

### 2.   Inventive Concept

If the court determines that a claim is directed to an abstract idea, the court proceeds to *Alice* step two.  That step requires the court "to examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."  *Alice*, 573 U.S. at 221 (quoting *Mayo*, 566 U.S. at 72, 78–79).

The "inventive concept" is "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  *Alice*, 573 U.S. at 217–18 (quoting *Mayo*, 566 U.S. at 72).  That step serves to ensure that the claim is directed to more than merely implementing an abstract idea using "well-understood, routine, [and] conventional activities previously known in the industry."  *Coop. Ent.,*

*Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022) (quoting *Alice*, 573 U.S. at 225). That is, *Alice* step two requires that the claimed invention do more than combine known techniques that "yield[] only expected results," *Universal Secure Registry*, 10 F.4th at 1353; it must "focus on a specific means or method that improves the relevant technology," *Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022) (citation omitted).  In particular, the Federal Circuit has asked whether the claim or claims at issue are "directed to a technological solution to a technological problem." *cxLoyalty, Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367, 1378 (Fed. Cir. 2021); *see also BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350–51 (Fed. Cir. 2016); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014).[1]

### B.  Application

As noted, Judge Stark found, for purposes of BFT's motion to dismiss, that step one of the *Alice* test was satisfied because the '890 patent is directed to an abstract idea.  But he then determined that step two of the *Alice* test had not been satisfied, for purposes of the motion to dismiss, because BFT had not shown that the asserted claims were directed to well understood, routine, and conventional activities.  Each party insists that the finding that favors it resolves that issue in its favor.

I am mindful of Judge Stark's rulings.  However, Judge Stark was careful to note that he was unable to make a finding that "the claimed combination of elements was conventional, routine,

---

[1]  The case law suggests that the question whether the claims recite a "technological solution to a technological problem" may also be considered at step one of the *Alice* test.  *See, e.g.*, *Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1309 (Fed. Cir. 2020); *Universal Secure Registry*, 10 F.4th at 1352; *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1100 (Fed. Cir. 2021) (Reyna, J., concurring).  Nonetheless, *cxLoyalty*, *BASCOM*, and *DDR Holdings* make clear that the existence of a technological solution to a technological problem is an appropriate consideration at step two of *Alice*.  The Federal Circuit has recognized that there is some overlap between the two steps.  *See CareDx, Inc. v. Natera, Inc.*, 40 F.4th 1371, 1379 (Fed. Cir. 2022) (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d at 1353).

and well understood . . . on the limited record and drawing all reasonable inferences in the plaintiffs' favor, as the Court is required to do." Dkt. No. 50 at 8. Judge Stark made clear that Body Fit would "be permitted to raise the step two issue on summary judgment." *Id.* Now that the case has proceeded to the summary judgment stage, at which a different legal standard applies and evidence beyond the pleadings is in the record, I will revisit the patent-eligibility analysis as to both step one and step two.

### 1. *Alice* Step One

The *Alice* step one inquiry considers "what the patent asserts to be the focus of the claimed advance over the prior art." *Yu*, 1 F.4th at 1043 (citation omitted). In ruling on BFT's motion to dismiss, Judge Stark held that claim 1 of the '266 patent is directed to the abstract idea of "storing, sending, and retrieving information over a network." Dkt. No. 50 at 3–4. F45 objects to that characterization as too broad; it argues instead that the invention claimed in the '890 patent should be characterized as providing "a new way to configure and operate a fitness studio." Dkt. No. 187 at 9. Specifically, F45 contends that the claims are directed to how a "studio information program file" is used to "dictate[] the physical configuration of the gym and how to operate the studio." *Id.* But even that narrower characterization of the invention would still be directed to an abstract idea, for several reasons.

First, the idea of configuring and operating a fitness studio is, at its core, a "method of organizing human activity." *See Alice*, 573 U.S. at 220. Fitness studios have existed as a business concept for decades, and the benefits provided by the '890 patent relate primarily to efficiencies associated with implementing the operation of a fitness studio with the aid of computers, networking components, and computer peripherals, such as display monitors. For example, the technology described in the '890 patent allows studios to arrange for daily variation in the exercises

prescribed for customers and for the use of exercise station displays to instruct customers on how to perform particular exercises. *See, e.g.*, '890 patent, col. 3, ll. 33–59.  As discussed in further detail below, the underlying objectives of the '890 patent—providing variety to the customer by changing the studio layout and exercise routines on a periodic basis, and providing instructions to the customers about those routines—are not themselves inventive.  Moreover, those objectives could be implemented without any computing technology at all.  The use of computers and networking components serves simply to make the operation of such a fitness studio more efficient and, according to F45, more attractive to customers.  That is not enough to convert an otherwise abstract idea into a patent-eligible concept. *See Simio*, 983 F.3d at 1361.

Second, the '890 patent does not purport to provide any meaningful advance in computing technology.  The technical components identified in claim 1 are all generic: they consist of a "server," a "database," a "studio computer," a "communications network," and an "exercise station display."  '890 patent, claim 1.  The specification of the '890 patent does not suggest that any of those components are unique, such that claim 1 can be said to capture "a specific asserted improvement in computer capabilities" rather than a process "for which computers are invoked merely as a tool." *See Enfish*, 822 F.3d at 1336.  And simply applying those generic components in a new context—in this case, a fitness studio—does not render the claimed advance of the patent any less abstract. *See ChargePoint,* 920 F.3d at 768 (holding that "communication over a network for interacting with a device, applied to the context of electric vehicle charging stations" was an abstract idea); *SAP Am.*, 898 F.3d at 1169 ("[L]imitation of the claims to a particular field of information . . . does not move the claims out of the realm of abstract ideas.").

At oral argument on the motion for summary judgment, F45 was asked whether the claims of the '890 patent would be patent-eligible if the claimed method steps were all performed by a

human, rather than by using a computer network.  F45's counsel did not provide a definitive answer to that question.  In any event, replacing the computer-implemented features of the invention with human actors or an instruction manual would leave only limited and general features.  In claim 1, the only non-computer related limitation is "periodically redistributing the exercise stations within the fitness studio."  Claim 2 would add nothing concrete, as the additional limitations of that claim are directed to functional steps for storing studio information program files in a generic database. Claim 3 would add only "providing periodic variation of exercise programs."  And claims 4 and 6 would add only "exercise parameters" (claim 4) specifying one or more of the duration of each exercise, the number of repetitions of each exercise, the rest period between exercises, and an instruction designating which station to visit next (claim 6).  Those components are wholly lacking in specificity.  Moreover, they describe measures of the kind that are inherent in directions given to users in connection with the performance of any prescribed series of exercises.

Third, the method steps of the asserted claims are described mainly in functional terms. For example, claim 1 recites the following steps, at a high level of abstraction:  "retrieving, by a server from a database, studio information program file"; "communicating . . . over a communications network"; "receiving, by the studio computer, the communicated studio information program file"; "periodically physically redistributing exercise stations"; and "communicating . . . station directions to users exercising at the [exercise] stations."  '890 patent, claim 1.  Those steps describe functional results, but do not "sufficiently describe how to achieve th[o]se results in a non-abstract way."  *Two-Way Media*, 874 F.3d at 1337; *see also Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2019) (Claims are directed to an abstract idea because they do not explain "*how* the drivers do the conversion that [the plaintiff] points to. . . .  The mere *function* of converting is not a 'specific improvement to the way computers

14

operate.'" (citation omitted)); *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) ("[T]he claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it.").

Fourth, F45's position as to step one of the eligibility inquiry would accord patent protection to a method consisting of simply redistributing exercise stations and varying exercise programs, even when effected with the aid of a computer network and program files. As such, it would result in the preemption of a wide range of activities relating to the operation of a fitness studio.

Specifically, the claims of the '890 patent would effectively preempt virtually any method of creating variety in exercise routines at a fitness studio through the use of a computer network. The limitations of the asserted claims that are directed to computer implementation merely require retrieval of a program file that is different from the program file retrieved for a previous period; that the file is communicated to the exercise studio; and that the file contains directions to users exercising at particular exercise stations in the studio. Those limitations would preempt virtually any system involving the communication of exercise instructions to an exercise studio that included directions to users, as long as the instructions were not uniformly unvarying as to the type or sequence of exercises they conveyed. The broad preemptive scope of the claims thus provides further support for BFT's contention that the asserted claims of the '890 patent are directed to the abstract idea of configuring and operating a fitness studio using information received over a computer network.

Simply put, the general concepts of providing directions for exercises and varying exercise programs are clearly abstract ideas. And it is well settled that adding generic computer implementation to an abstract idea does not render it patent-eligible. *See Alice*, 573 U.S. at 225–

26.   Therefore, using a computer network to facilitate the steps of providing instructions and varying exercise programs by redistributing exercise stations and varying the exercise programs is not patent-eligible subject matter at *Alice* step one.  I next proceed to whether the claims recite an inventive concept under *Alice* step two.

### 2.   *Alice* Step Two

Step two of the *Alice* test for patent eligibility requires the court to determine whether the claim at issue contains an "inventive concept."  In a case such as this one, in which the crucial question is whether the computer implementation of the asserted claims lends the claims the necessary inventiveness to confer patentability, the court must ensure that the relevant implementation consists of more than generic computers and networking components executing "well-understood, routine, [and] conventional activities previously known to the industry." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014).

Rather than arguing that a particular claim limitation provides the required inventive concept, F45 argues that the claimed combination of elements represents an invention that was not well understood, routine, and conventional as of the priority date of the '890 patent.  Specifically, F45 points to the benefits of its purportedly unique training system with multiple exercise stations and accompanying displays.  In support, F45 cites the testimony of its expert, Bryan K. O'Rourke, along with the testimony of other F45 witnesses and various news articles touting the benefits of F45's training system.

For this argument to succeed, F45 needs to tie the evidence regarding its allegedly inventive training system to the claims at issue.  It is not enough to argue that the specification describes an unconventional method; the unconventional features of the invention, if any, must be found in the

16

claims.  *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves."); *see also Yu*, 1 F.4th at 1045 ("[T]he *claim*—as opposed to something purportedly described in the specification— is missing an inventive concept.") (quoting *Two-Way Media*, 874 F.3d at 1338).

The limitations of the asserted claims do not recite unconventional features.  For example, claim 1 does not limit the display structure described in the specification of the '890 patent in any meaningful way, even if F45's embodiment of choice does.  In fact, the only display-related limitation taught by claim 1 is that the displays have some form of instructions about the exercises "communicated" from a central source and "received" through a studio computer.  But the mere "communicati[on]," "recei[pt]," and "display[]" of computer files do not render F45's display structure an inventive concept sufficient to transform the abstract idea into a patent-eligible invention.  *See Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1325, 1345 (Fed. Cir. 2018) (acquiring, organizing, and displaying information is an abstract idea); *Cap. One Fin. Corp.*, 850 F.3d at 1341 (same); *Elec. Power Grp.*, 830 F.3d at 1354 (same).  Those cases characterize organizing and displaying information as an abstract idea, and the Federal Circuit has made clear that to satisfy step two of *Alice*, an alleged inventive concept must be "significantly more" than the abstract idea itself.  *ChargePoint*, 920 F.3d at 774.  If the purported improvement "just restate[s] the abstract idea[]," it does not qualify as an "inventive concept" for purposes of section 101 analysis.  *PersonalWeb Techs. LLC*, 8 F.4th 1310, 1318 (Fed. Cir. 2021).

The features claimed in the '890 patent can be divided into two categories: those that are directed to computer implementation and those that are not.  The Supreme Court in *Alice* made clear that the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patentable invention."  *Alice*, 573 U.S. at 223.  Thus, when claims are directed to an

abstract idea and what is added is merely generic computer implementation, the claims "do not move into section 101 eligibility territory" at *Alice* step two. *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1374 (Fed. Cir. 2017). Put more succinctly, step 2 of *Alice* is not satisfied when "the claims at issue use generic computer components . . . to carry out the abstract idea." *Id.* at 1375 (cleaned up); *see also Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1330 (Fed. Cir. 2020) (merely adding computer functionality to increase the speed or efficiency of a claimed process does not confer patent eligibility on an otherwise abstract idea); *BASCOM*, 827 F.3d at 1350 (Claims that "merely recite the abstract idea . . . along with the requirement to perform it on . . . a set of generic computer components" do not contain an inventive concept.); *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324–25 (Fed. Cir. 2016) (Claims that add only "generic computer components such as an 'interface,' 'network,' and 'database'" do not satisfy the inventive concept requirement.); *Intell. Ventures I LLC v. Cap. One Bank*, 792 F.3d 1363, 1368 (Fed. Cir. 2015) ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible.").

The problem for F45 is that the claims of the '890 patent use only generic computer and networking components to implement the computer-based features of the claims. *See, e.g.*, '890 patent, col. 5, ll. 1–3, 20–46. Dr. Bryan Bergeron, BFT's expert, stated the retrieving, communicating, and receiving steps of the claims "do not implement new or improved data storage or communication schemes. The claim elements, alone or together, do not improve the performance of the underlying computer technology in terms of speed or efficiency." Dkt. No. 183-1, Exh. D, ¶ 239. F45 does not rebut that opinion. In fact, Joshua Oliver, one of F45's corporate representatives, admitted as much when he testified that F45's commercial embodiment

of the claimed invention uses conventional computing technologies such as mySQL databases, MP4 video files, JSON-based APIs, CPUs, graphics cards, and the Android operating system. Dkt. No. 183-2, Exh. J, at 28:22–31:7. The record therefore makes it clear that the invention does not reside in innovations in computing technology. The critical question then becomes whether the features of the claims that do not involve computers provide an inventive concept beyond "the abstract idea itself." *See ChargePoint*, 920 F.3d at 775.

Turning to the features of the claims detached from their computer implementations, F45 focuses heavily on the "surprise element" associated with the variation in exercise routines over time as providing an inventive concept. *See* Dkt. No. 187 at 16. That "surprise element," however, is not a requirement of the claims. As noted in the *Markman* order previously entered in this case, the required "variation" between exercise routines can "include any difference between exercise programs," such as a difference in the rest time between exercise sets. Dkt. No. 96 at 15. There is no "certain subjective level of significance in the variation [that] must be reached for the method to fall within the scope of the claims." *Id.* Although F45's preferred embodiments might include significant variations in the nature of the exercise programs between periods, none of those features are specifically claimed, and thus they cannot provide the requisite inventive concept at *Alice* step two.

Moreover, the evidence establishes that physically redistributing or rearranging exercise stations in fitness studios was well known and conventional at the time of invention of the '890 patent. F45's expert, Mr. O'Rourke, explained in his deposition that it was "not uncommon" in 2014 for fitness studios to redistribute exercise stations, Dkt. No. 191-1, Exh. A, at 138:25–139:20, and that he had previously worked with a fitness studio at which "exercises would be performed at different places at different times." *Id.* at 71:8–18. He added that equipment would be moved

19

into and out of an exercise station depending on "whatever was relevant to the particular program that was being offered." *Id.* at 72:16–22. Asked whether it was common in 2014 and before to physically redistribute exercise stations at exercise studios, Mr. O'Rourke replied, *id.* at 139:3–12:

> In group fitness, it was not uncommon in, like, a Les Mills class with respect to the format of a program, from – in certain instances, depending on the program.
> In some [High Intensity Interval Training] classes using functional equipment, you might move it around a lot more, based, again, on the programming and the equipment.
> So, yeah, redistributing equipment is something that you might have to do in certain programs.

Mr. O'Rourke's admissions regarding the practices at fitness studios prior to F45's patent are reinforced by Dr. Bergeron's expert report, which cites prior art references that include the physical redistribution of exercise stations. *See* Dkt. No. 183-1, Exh. D, ¶¶ 110–18. For example, U.S. Patent Publication No. 2012/0309551 ("Holzhacker") addresses the spatial arrangement of equipment in an exercise studio and explains that "to render the exercise both entertaining and varied, . . . the arrangement may be periodically changed without difficulty." Holzhacker ¶ 10. Likewise, U.S. Patent Publication No. 2014/0363800 ("Harris") discloses an exercise studio with multiple booths that each contain one or more exercise stations, and states that it "may be desirable to periodically replace one piece of exercise equipment with another within a given booth" for various purposes, including "to alter the exercise provided within that booth." Harris ¶ 74. And U.S. Patent Publication No. 2015/0134089 ("Shanahan"), which is directed to a personalized high intensity interval training platform, provides that a platform operator "may adjust the predetermined work out plans as they see fit by, for example, replacing or removing equipment at a given station with different equipment and/or specifying a new exercise to be performed at a station." Shanahan ¶ 37.

Similarly, in the course of his deposition Mr. O'Rourke admitted that a prior art reference to "Rao" describes "in general" the use of a computer network "that includes a central server that can store information about fitness programs and classes, and that information can be downloaded by computers within a fitness studio."   Dkt. No. 191-1, Exh. A., at 221:24–222:10.   The Rao reference, U.S. Patent Publication No. 2007/0033069, which was filed in 2005, is discussed in detail in Dr. Bergeron's report.   *See* Dkt. No. 183-1, Exh. D, ¶¶ 83–84, 95, 103, 111, 120, 133, 138, 142, 159, 167, 172, 183.   In addition to disclosing computer-implemented operation of a fitness studio in general, the Rao reference discloses user interfaces that display visual information to the user, *see* Rao ¶ 70, which includes a variety of exercise parameters, *see, e.g., id.* ¶¶ 112; Dkt. No. 183-1, Exh. D, ¶ 183.

More generally, Dr. Bergeron's report cites a number of prior art references from as early as 2001 that disclose each of the limitations in each of the asserted claims.   While the fact that a particular limitation is found in a prior art reference does not by itself establish that the limitation is "well understood, routine, and conventional" for purposes of step two of the section 101 analysis, the presence of multiple prior art references going back years before the priority date of the invention at issue can provide important evidence that the limitation relied on by the patentee does not constitute an "inventive concept" for section 101 purposes.   *See GREE Inc. v. Supercell OY*, No. 2:19-cv-70, 2020 WL 887733, at *2 (E.D. Tex. Feb. 24, 2020) (The court "must compare th[e] inventive concept to the universe of prior art to determine whether the claims merely involve activity that was 'well-understood, routine and conventional.'"); *Cal. Inst. Of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 992 (C.D. Cal. 2014) ("[C]onventional elements do not constitute everything in the  prior art, although conventional elements and prior art may overlap."); *see also Mayo*, 566 U.S. at 90 ("We recognize that, in evaluating the significance of additional

steps, the § 101 patent-eligibility inquiry and, say, the § 102 novelty inquiry might sometimes overlap.").

For claims 1 and 3, Dr. Bergeron cites Rao, Holzhacker, Harris, Shanahan, and seven other references as disclosing each of the limitations of those claims. *See* Dkt. No. 183-1, Exh. D, ¶¶ 82–127. For example, Rao discloses a fitness studio with servers configured to include databases that store fitness information, and in which the fitness information in the servers can be accessed via remote computers that periodically synchronize the fitness information stored in the local memory with fitness information stored in the servers. *See* Rao ¶¶ 33–34. The system described by Rao also includes exercise machine console user interfaces that can be configured to display visual information such as exercise machine operating information. *Id.* ¶ 70.

Several of the other prior art references discussed by Dr. Bergeron disclose similar computer-implemented systems for operating fitness studios by assembling a library of exercises in a server and making them available via a display monitor to one or more individual users at exercise stations in the studio. *See* U.S. Pat. Publication No. 2002/0055419 ("Hinnebusch") ¶¶ 17, 93, 239, 260, 263, 270, 293 & Fig. 9; *see also* Harris ¶¶ 19–20, 81–82, 148; Holzhacker ¶¶ 13, 58, 61, 72; U.S. Pat. No. 7,857,731 ("Hickman"), col. 7, ll. 7–10, col. 8, ll. 26–36, col. 28, ll. 42–46, claim 18; U.S. Pat. No. 8,727,948 ("Herranen"), col. 4, ll. 17–22, 61–64, col. 5, ll. 59–65.

As for claim 2, which is directed to constructing, indexing, and storing program files for multiple periods, Dr. Bergeron's report features the Hinnebusch, Herranen, and Rao references. *See* Dkt. No. 183-1, Exh. D, ¶¶ 128–44. Those references disclose the capacity to modify exercise parameters over multiple time periods. *See* Hinnebusch ¶¶ 146, 239, 293; Herranen, col. 2, ll. 26–28, col. 4, ll. 61–64, col. 7, line 45, through col. 8, line 8; Rao ¶ 112.

Claim 4 requires that the studio information file comprise one or more of a physical layout for the exercise studio, video files demonstrating exercises to be performed at the stations, and exercise parameters for performing the exercises.  For those limitations, Dr. Bergeron's report relies principally on Hinnebusch, Holzhacker, Harris, and Rao.  *See* Dkt. No. 183-1, Exh. D, ¶¶ 145–86.  Hinnebusch provides that the business operations database will contain "information on gym sites," "the types of fitness equipment at each site, and parameters of exercise routines." Hinnebusch ¶ 93.  It also provides that the exercise routine may be accompanied by video messages or text and graphics "provided through a web browser interface to describe the parameters of an exercise routine." *Id.* ¶ 96; *see also id.* ¶¶ 20, 115.  Harris states that the server provides the personalized exercise regimen for each user as well as the "booth arrangement and sequence of the exercise facility," Harris ¶ 92, and that "videos, graphic images, or animation" will be "displayed on the display screen of the handheld electronic device that instruct the user how to perform the exercise within each booth." *Id.* ¶ 20.  Holzhacker discloses that the terminals may be used "to indicate to the exerciser the parameters adopted for the exercises, such as the number of repetitions, weights used, etc." Holzhacker ¶ 58.

Claim 6 adds to claim 4 that the exercise parameters must include one or more of a duration parameter, a repetition parameter, a rest parameter, and an instruction directing the user to the next exercise station.  As for those limitations, U.S. Patent Publication No. 2006/0223674 ("Korkie"), Harris, and Hinnebusch all disclose a duration parameter for the prescribed exercises.  *See* Korkie ¶ 72; Harris ¶ 99; Hinnebusch ¶¶ 17, 100.  Harris, Korkie, and Rao all disclose a repetitions parameter.  *See* Harris ¶¶ 85, 99; Korkie ¶¶ 70, 97; Rao ¶ 79 & Fig. 11.  And both Harris and Korkie disclose a rest parameter.  Korkie ¶ 104; Harris ¶¶ 99, 128.  Finally, with respect to prescribing movement from one exercise station to the next, Harris, Korkie, Herranen, and

Shanahan all disclose that limitation of claim 6.  *See* Harris ¶¶ 20, 79; Korkie ¶ 85; Herranen, col. 6, ll. 45–46; Shanahan ¶¶ 18, 34.

In its briefing, F45 suggests that the inventive concept is closely tied to the use of a "fitness library" containing files consisting of pre-programmed exercise routines.  However, the general act of "retrieving" computer files is not inventive.  *See Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1330 (Fed. Cir. 2017) ("Remotely accessing and retrieving user-specified information is an age-old practice that existed well before the advent of computers and the Internet.").  That leaves the question of whether the particular character of F45's studio program library adds inventiveness—specifically, whether the fact that the retrieved files come from a pre-programmed library of exercises lends the necessary inventiveness to overcome unpatentability.

Federal Circuit precedent establishes that it does not.  In *Apple, Inc. v. Ameranth, Inc.*, the claimed invention was a computerized information management and communication method for generating and transmitting menus with a preferred embodiment in the restaurant industry.  842 F.3d 1229, 1234 (Fed. Cir. 2016).  In its analysis of *Alice* step two, the Federal Circuit concluded that the claimed invention was meant to be a replacement for a "a server's notepad or mental list with an electronic device programmed to allow menu items to be selected as a customer places an order."  *Id.*  at 1242.  Because the invention ultimately entailed only the addition of conventional computer components to a well-known business practice, the Federal Circuit found it to be unpatentable.  *Id.*  at 1243.

The claims of the '890 patent suffer from a similar flaw.  In the same way that the invention at issue in *Ameranth* was the equivalent of a server's notepad, the '809 patent's fitness library containing exercise instructions is the computerized equivalent of a fitness instructor's notepad. In a typical fitness studio, the well understood, routine, and conventional practice would be for a

24

human fitness instructor to provide exercise instructions to customers.  At F45's studio, the fitness instructor is replaced by a computer attached to a display.  This simple allocation to a computer of a task commonly and adequately performed by a human is not enough to confer patentability.  *See Cap. One Bank*, 792 F.3d at 1367 ("Nor, in addressing the second step of *Alice*, does claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept.").

In light of the evidence of record, F45 has failed to point to any feature of the asserted claims of the '890 patent that qualifies as an inventive concept within the meaning of that term as used in the *Alice* line of cases.  None of the features of the asserted claims, individually or as a combination, amount to "significantly more" than the abstract idea of configuring and operating a fitness studio using information received over a computer network.  *See Alice*, 573 U.S. at 218 (quoting *Mayo*, 566 U.S. at 73).  Nonetheless, F45 raises two additional arguments in opposition to BFT's motion for summary judgment.

First, F45 argues that the commercial success of F45's fitness studios is evidence of the unconventionality of the asserted claims. Dkt. No. 187 at 19–23.  As the Federal Circuit has noted, however, "[c]ommercial success is not necessarily a proxy for an improvement in a technology nor does it necessarily indicate that claims [are] drawn to patent eligible subject matter." *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1335 (Fed. Cir. 2015); *see also WhitServe LLC v. Dropbox, Inc.*, 854 F. App'x 367, 373 (Fed. Cir. 2021) ("Objective indicia of nonobviousness are relevant in a § 103 inquiry, but not in a § 101 inquiry."); *Ficep Corp. v. Peddinghaus Corp.*, No. 19-cv-1994, 2022 WL 608189, at *8 n.4 (D. Del. Feb. 28, 2022) (noting that it is inappropriate "to consider secondary considerations of nonobviousness in determining patentability under § 101").  Nor does the purported novelty of F45's exercise studio concept make its claims

patentable.  To the contrary, as the Supreme Court has pointed out, "The 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possible patentable subject matter." *Diamond v. Diehr*, 450 U.S. 175, 188–89 (1981).   Even a purportedly "paradigm-shifting" application of an abstract idea is nevertheless unpatentable. *ChargePoint*, 920 F.3d at 774; *Yu*, 1 F.4th at 1045 ("[E]ven if claim 1 recites novel subject matter, that fact is insufficient by itself to confer eligibility."); *SAP Am.*, 898 F.3d at 1163 ("We may assume that the techniques claimed are '[g]roundbreaking, innovative, or even brilliant,' but that is not enough for eligibility.") (citation omitted); *Synopsys*, 839 F.3d at 1151.  F45's evidence of commercial success therefore does not support its contention that the claims of the '890 patent are directed to patent eligible subject matter.

Second, F45 argues that Mr. O'Rourke's testimony creates a genuine dispute of material fact as to the presence of an inventive concept in the asserted claims, because that evidence has not been rebutted by any expert testimony or other evidence offered by BFT.  Dkt. No. 187 at 14. F45 cites a number of cases in which courts have found the existence of expert testimony to create a genuine issue of material fact.  But the Federal Circuit has made clear that the introduction of expert testimony by the non-movant does not necessarily require the denial of a summary judgment motion. *Mortg. Grader, Inc.*, 811 F.3d at 1325–26 ("The mere existence in the record of dueling expert testimony does not necessarily raise a genuine issue of material fact."); *see also CareDx*, 40 F.4th at 1377–81 (Fed. Cir. 2022) (holding claims unpatentable under section 101 despite the existence of contrary expert testimony in the record); *see also Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) ("Patent eligibility has in many cases been resolved on motions to dismiss or summary judgment.  Nothing in this decision should be viewed as casting doubt on the

26

propriety of those cases.  When there is no genuine issue of material fact regarding whether the claim element or claimed combination is well-understood, routine, conventional to a skilled artisan in the relevant field, this issue can be decided on summary judgment as a matter of law.").

From a close analysis of the evidence proffered by F45 through Mr. O'Rourke's expert report, it is evident that none of it shows that the limitations of the asserted claims provide the "inventive concept" required by step two of *Alice*.  The evidence summarized by Mr. O'Rourke was as follows (*see* Dkt. No. 188-1, Exh. 2, ¶¶ 94–108):

- A representative of an investment firm stated in his deposition that the reason his company invested in F45 was because of "the unique fitness concept and the member experience that we felt was differentiated from all of the other fitness concepts that we were aware of," and because of what he believed to be F45's "unique business model."  In particular, he stated that "the use of screens to assist studio users in working through a multi-station group workout was completely new at the time."  *Id.* ¶¶ 95–99.

- Richard Burnet, BFT's CEO, testified in his deposition that there were elements of F45's approach to the fitness studio business that were new to him, including the "loud pumping music" and the "screens on TVs."  *Id.* ¶ 99.

- F45 employee Luke Armstrong testified in his deposition that what F45 offered in the fitness studio market was "unique."  He explained that "we wanted to deliver an experience that was varied but also structured, so that the user had an expectation of what they were going to get, but there was a surprise element, which would keep it fresh and keep it compelling."  *Id.* ¶ 100.

27

- F45 employee Damien Rayner testified in his deposition that the "very unique franchise and business model" was the result of "a combination of the workout, the business systems, [and] the technology." He added that "technology creates a very unique experience and also a lot of the other stuff that's patented around the movements, around where equipment is." He identified the technology as "the screens . . . [and] the way the screens enable us to be able to deliver workouts and be able to do workouts that re always different and var[ying]." *Id.* ¶ 101.

- F45 employee Jake Hall testified in his deposition that "the technology piece is . . . critical to making it easy for prospective members to . . . come into the facility. Whether they do or do not have . . . training experience themselves, it's a . . . platform where they can come into an environment and feel comfortable because, one, they're able to take guidance clues directly from . . . a TV." *Id.* ¶ 102. He added that the F45 technology freed trainers to "engage each member individually." *Id.*

- F45's CEO, Adam Gilchrist, testified in his deposition that "[w]e developed our technology to enable us to be the founders of this great idea and train 36 different people in 36 different stations." He said that in exercise studios prior to F45, "people were training in chaos, unorganized, where no one knew when to change stations and then when they did what they should do." He added that before F45, "[n]ot one studio in the world had an exercise TV." *Id.* ¶ 103.

- Mr. O'Rourke himself stated that in his personal experience in the fitness industry, noting that he "never saw anything like or closely resembling the invention of the '890 Patent or the fitness phenomenon enabled by that invention." *Id.* ¶ 104.

28

- In addition to the witnesses' deposition testimony, F45 points to several statements and press reports regarding F45's fitness programs; most of the quoted comments focused on the large displays used to guide users through exercise routines.[2] *Id.* ¶¶ 106–08.

That evidence does not support F45's contention that the asserted claims contain an "inventive concept" as that term has been understood in the developing section 101 jurisprudence discussed above.  First, F45's evidence is focused heavily on the fact that F45's system relies on computing technology, in particular the display screens employed at the exercise stations that display information from a studio information program file to direct studio customers in performing the exercises at each station.  As noted above, however, simply using a computer, networking components, and computer peripherals to perform tasks that were previously performed (or that could be performed) by humans is not inventive.  Thus, the fact that F45 uses studio information program files and display screens to instruct users and guide them in performing their exercises is not sufficient to provide the "inventive concept" required by step two of *Alice*. *See SAP Am., Inc.*, 898 F.3d at 1170; *Smart Sys.,* 873 F.3d at 1374; *Elec. Power Grp.*, 830 F.3d at 1355 ('[I]nvocations of computers and networks that are not even arguably inventive are insufficient to pass the test of an inventive concept in the application of an abstract idea.").

---

[2]  Mr. O'Rourke's excerpts of the statements in paragraph 106 of his report that praise the F45 technology come from two articles posted on the Internet, both of which quote extensively from F45's then-CEO, Rob Deutsch.  *See* Dkt. No. 188-2, Exhs. 25 & 26.  The three press reports listed in paragraph 107 of Mr. O'Rourke's report focus on the monitors that guide users through their sessions; they also refer to other unclaimed features of the F45 studios, such as "a live DJ spinning loud, up-tempo pop music throughout the session," and "a wider variety of equipment" not found in traditional group fitness studios.  *See* Dkt. No. 188-1, Exh. 2 at ¶ 107 (citing URLs for three press reports from 2016 and 2017).

Second, many of the comments about the innovative nature and success of the F45 studios were focused on items that were not claimed in the asserted claims of the '890 patent. Apart from the focus on the displays used to direct the users' performance of their exercise routines, the comments set forth in Mr. O'Rourke's report cited very general considerations such as F45's "unique fitness concept and the member experience," the "very unique community like feeling in the studios," the "loud pumping music," the "surprise element," and the "combination of the workout, the business systems, the technology," i.e.,"[e]verything that's behind . . . what creates a very unique franchise and business model." *See* Dkt. No. 188-1, Exh. 2, ¶¶ 94–104. F45 has failed to tie the allegedly unconventional features of its exercise programs to the specific limitations of the asserted claims. Mr. O'Rourke's testimony therefore does not create a triable issue with respect to section 101.

Third, much of the evidence cited by Mr. O'Rourke touts the commercial success of F45's studios. But, as noted, the commercial success of a patentee's product does not necessarily indicate that the company's patent contains an inventive concept. F45's evidence indicates why that is so: The evidence fails to tie the "member experience" in the F45 studios to the specific steps set forth in the claims. The statements regarding the success of the F45 model were mainly tied to the use of computer displays in place of human instructors, which is not an "inventive concept," or were directed to more general (and unclaimed) features such as the "unique fitness concept and member experience," assertions that are too general to be attributable to particular claimed features.

Ultimately, F45 has failed to point to any evidence that the specific limitations found in the claims, or any combination of those limitations, adds any inventive concept to the underlying abstract idea. There is therefore no genuine issue of material fact as to the application of *Alice*

step two in this case.  Based on the foregoing analysis, summary judgment will be granted to BFT that the asserted claims are invalid under 35 U.S.C. § 101.

### III.   Infringement

BFT also moves for summary judgment of non-infringement with respect to each of the asserted claims of the '890 patent.  BFT argues that it does not infringe claims 1 and 2, because two of the steps of independent claim 1 (on which claim 2 depends) are performed outside the United States.  BFT also argues that it neither directly nor indirectly infringes claims 3, 4, or 6 of the '890 patent.  Although it is not strictly necessary to reach the issue of infringement given my ruling on the section 101 issue above, I reach that issue in the interest of completely resolving the disputes before me, in the event there are any further proceedings in this case.

#### A.  Claims 1 and 2

BFT points out that even accepting F45's theory of infringement, BFT's accused systems perform both of the server-side limitations of claims 1 and 2 in Australia.  For that reason, BFT asserts that it does not directly infringe claims 1 and 2.

The use of a patented method does not infringe unless "each of the steps is performed within this country." *NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005). BFT's briefing focuses on two steps of claim 1: (1) "periodically retrieving, by a server from a database, a studio information program file"; and (2) "communicating, by the server to a studio computer associated with the particular studio, the retrieved studio information program file." BFT has proffered evidence that BFT's databases and servers are located in Australia, and that the employee who distributes the file containing the exercise routine information to studios is located in Australia as well.  Accordingly, BFT argues, the "periodically retrieving" and "communicating" steps are not performed in the United States.  F45 has not presented any evidence suggesting that

those steps are performed in the United States, but instead raises other arguments for why summary judgment should be denied.

First, F45 argues that BFT infringes claims 1 and 2 by selling and offering to sell the claimed methods to its U.S. franchisees, even if those methods are not actually performed in the United States. In support of its argument, F45 cites two cases in which the Federal Circuit declined to address the question whether a method claim can be infringed by "selling" or "offering to sell" the claimed method. Dkt. No. 187 at 39 (citing *NTP*, 418 F.3d at 1320–21, and *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1334 (Fed. Cir. 2008)). However, F45 fails to note that the Federal Circuit in the *NTP* case held that "RIM's performance of at least some of the recited steps of the asserted method claims cannot be considered to be selling or offering to sell the invention covered by the asserted method claims." 418 F.3d at 1321. That description fits the facts of this case, where BFT (or BFT Australia, allegedly at BFT's direction) performs some of the recited steps of claims 1 and 2. As in *NTP*, the defendants therefore cannot be held to have sold or offered to sell the infringing method, even assuming that a method claim can be infringed by selling or offering to sell the claimed method.

Second, F45 suggests that "production and distribution of [BFT] class programming will transition to the United States." Dkt. No. 187 at 34–35. That assertion, even if grounded in evidence, does not establish that BFT currently produces and distributes its exercise information in the United States or has done so in the past. At most, it suggests that the steps of claims 1 and 2 might be performed in the United States at some point in the future. Such a suggestion is insufficient to establish that BFT directly infringes claims 1 and 2 of the '890 patent at present.

Accordingly, summary judgment will be granted that BFT does not infringe claims 1 and 2 of the '890 patent.

### B.  Claims 3, 4, and 6

BFT argues that it does not directly infringe claims 3, 4, and 6, because the method steps of those claims are actually performed by BFT's franchisees, not by BFT itself.  BFT also argues that it is not liable for either contributory infringement or induced infringement of those claims.

#### 1.  *Direct Infringement*

F45 does not challenge BFT's assertion that it does not directly perform any of the limitations of claims 3, 4, and 6.  In fact, F45 acknowledges that it is "[t]he operators of the U.S. BFT Franchises [who] practice every step of claims 3, 4, and 6."  Dkt. No. 187 at 26.  Those operators, however, are not defendants in this case.  The BFT defendants do not practice any of the steps of those claims, and therefore cannot be held liable for direct infringement based on their own infringing conduct.  Instead, F45 contends that the defendants "knowingly control and induce [the BFT franchisees'] infringement."  *Id.*

With respect to inducement, F45 makes a full argument that the BFT defendants induce infringement of claims 3, 4, and 6.  That argument is addressed in Part III.B.3, below.

With respect to F45's assertion that the BFT defendants "control" their franchisees' infringing conduct and therefore directly infringe some or all of the asserted claims, F45's argument is not set forth in any detail.  At the outset of its brief, F45 correctly states that direct infringement occurs when "all steps of a claimed method are performed by or attributable to a single entity."  Dkt. No. 187 at 6 (citing *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015)).  At the end of its brief, in a section directed to claims 1 and 2, F45 argues that the BFT Franchisees "are contractually obligated to operate the accused product in an infringing fashion" and thus that the defendants "require the US BFT studios to operate in an infringing manner" and thereby directly infringe all five asserted claims.  Dkt. No. 187, at 40.

That argument is misplaced in a section directed to the direct infringement of claims 1 and 2, and it is unconvincing with respect to those two claims for the reasons discussed above, i.e., because two of the steps set forth in those claims are performed outside the United States. The argument has force, however, to the extent it raises the issue of joint (or divided) infringement of claims 3, 4, and 6. As the Federal Circuit explained in *Akamai* and has reaffirmed in subsequent decisions, a party can be held liable for direct infringement if that party directs or controls the infringing activity of another, or if the defendant and the infringing party are part of a joint enterprise with regard to the infringing conduct. *See Akamai,* 797 F.3d at 1022; *see also Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1380 (Fed Cir. 2017); *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339–40 (Fed. Cir. 2016); *IOENGINE LLC v. PayPal Holdings, Inc.*, No. 18-452, 2019 WL 330515, at *1–3 (D. Del. Jan. 25, 2019); *Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 580–81 (D. Del. 2018).

F45 argues that as a consequence of the franchise agreements, the BFT defendants direct and control the conduct of the U.S. franchisees in a manner that results in the franchisees' performance of the limitations of claims 3, 4, and 6. The language of the franchise agreements is sufficient to create a factual question as to that contention. BFT's motion for summary judgment as to direct infringement of claims 3, 4, and 6 under a theory of joint (or divided) infringement will therefore be denied. However, as noted, F45 has failed to offer evidence or a viable legal theory in support of its claim that BFT is liable for direct infringement of claims 1 and 2 under a theory of joint (or divided) infringement. Summary judgment will therefore be granted as to claims 1 and 2 on that theory.

### 2. *Contributory Infringement*

On the issue of contributory infringement, BFT argues that it does not contributorily infringe claims 3, 4, and 6 of the '890 patent, because the named defendants do not provide the BFT franchises with any non-staple articles of commerce that have no substantial non-infringing uses. Specifically, BFT argues that it is BFT Australia, a different (and uncharged) entity, that provides the .BFT file that is necessary to support F45's allegations of infringement of claims 3, 4, and 6.

Contributory infringement occurs when someone sells, offers to sell, or imports "a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c).

F45 does not dispute that it is BFT Australia, not the defendants, that provides the .BFT files to BFT's franchisees. F45 argues, however, that there is a genuine dispute of material fact as to contributory infringement because "BFT Australia provides the .BFT file to the US BFT Franchises *at the express instruction* of the Defendants." Dkt. No. 187 at 38. Evidence that the named defendants instruct BFT Australia to provide the .BFT file to the franchisees may serve as evidence of induced infringement, but it does not establish that the defendants in this case sell, offer to sell, or import any material or apparatus that is used in the performance of the claimed methods.

The language of section 271(c) requires the "sale of a product of some sort," and not the provision of a service. *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1357 (Fed. Cir. 2007); *see also Nuance Commc'ns Inc. v. Tellme Networks Inc.,* 707 F. Supp. 2d 472, 487 (D.

35

Del. 2010) (holding that the provision of hosted technology services did not constitute contributory infringement because there was no "apparent transfer of property to the [alleged infringer's] customers"). And to the extent that F45 argues that the BFT defendants provide generic computer and networking components to the U.S. franchisees, those components clearly are "staple article[s] or commodit[ies] of commerce suitable for substantial noninfringing use." *See* 35 U.S.C. § 271(c). F45 cites no contrary authority suggesting that the evidence F45 has identified is sufficient to support a claim of contributory infringement.[3] Accordingly, summary judgment of no contributory infringement of claims 3, 4, and 6 will be granted to BFT.

### 3. Induced Infringement

On the issue of induced infringement, BFT makes several points in support of its motion for summary judgment. First, BFT argues that BFT's franchisees do not directly infringe claims 3, 4, and 6. Second, BFT argues that it did not possess the requisite intent to induce infringement. Third, BFT argues that the named defendants do not aid and abet any infringing activity.

With respect to the first point, I find that there is a genuine issue of material fact regarding whether BFT's franchisees directly infringe claims 3, 4, and 6. F45 has proffered the report of its expert, Dr. Henry H. Houh, which offers detailed explanations of how each limitation of claims 3, 4, and 6, is practiced by BFT's franchisees. Dkt. No. 188-1, Exh. 10, ¶¶ 309–609. BFT fails to respond to Dr. Houh's report on the merits, aside from making the conclusory assertion that "neither BFT nor its franchisees directly infringe claims 3, 4, or 6." Dkt. No. 182 at 37. In light

---

[3] In its brief, F45 makes a passing allusion to the BFT franchisees' obligation to pay the defendants "for the infringing components." Dkt. No. 187 at 37. But even assuming that those "components" refer to physical items such as computers and display monitors, there is no evidence that those components have no substantial non-infringing use, as is required for contributory infringement. On this issue, because F45 bears the ultimate burden of proof, its failure to offer any evidence that the "components" have no noninfringing use is fatal to its contributory infringement claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).

of the state of the record at this point in the proceedings, a factfinder could reasonably conclude that BFT's franchisees directly infringe claims 3, 4, and 6.

With respect to the second point, I find that there is a genuine issue of material fact regarding BFT's intent to induce infringement. F45 has offered evidence that BFT has known of the '890 patent since at least July 15, 2020, when a representative of F45 met with a representative of Body Fit and raised the issue of Body Fit's alleged infringement of the '890 patent. Dkt. No. 188-3, Exh. 41. BFT's co-CEO testified in a deposition that BFT knew of the '890 patent even prior to that date. Dkt. No. 188-1, Exh. 7, at 77:5–22. And F45 has offered evidence that BFT requires its franchisees to use BFT's technology as BFT directs; in return, BFT provides support to the franchisees. *See* Dkt. No. 187 at 28–30.

In response, BFT argues that it lacks the intent to induce infringement because of events that occurred with respect to F45's similar Australian patent. BFT points to evidence that F45 originally accused the predecessor of BFT Australia, an exercise studio called "Gymmy Squatz," of infringing F45's Australian patent, but that F45 subsequently notified Gymmy Squatz that it would not sue Gymmy Squatz for infringement. Dkt. No. 183-3, Exh. P. BFT also points to a determination by an Australian court that BFT did not infringe F45's Australian patent. Dkt. No. 183-1, Exh. F, ¶¶ 116–35. Even assuming that such evidence is relevant to whether BFT intended to induce infringement of a United States patent, it would create at most a dispute of fact as to the issue of intent. Accordingly, summary judgment will not be granted to BFT on that issue.

With respect to the third point, BFT argues that it does not induce infringement by its franchisees because neither the named defendants nor BFT Australia instructs the franchisees to "redistribute" exercise stations, as claims 1 and 3 require. In support of that assertion, BFT cites testimony that BFT's franchisees "have freedom to set up exercise equipment to best suit their

studio space," and that BFT Australia does not "impose any requirements for the set-up of exercise equipment in a given franchise."  Dkt. No. 182 at 40 (citing Dkt. No. 183-2, Exh. I, at 79–80).

F45 does not specifically address that argument in its brief, but Dr. Houh's report indicates that there is a factual dispute as to the issue.  Dr. Houh notes in his report that "[g]ym operators configure the exercise equipment [within a BFT studio] to match the scheduled class from the studio information program file."  Dkt. No. 188-1, Exh. 10, ¶ 436.  Dr. Houh also points to testimony indicating that the .BFT file includes information such as "how many stations to set up per exercise."  *Id.* ¶ 443 (citation omitted).  Based on that evidence, a reasonable factfinder could conclude that BFT Australia implicitly instructs the BFT franchisees to redistribute exercise stations by requiring the use of certain exercises and certain numbers of stations, as prescribed in the .BFT file.  And, as noted, F45 has pointed to evidence that the named defendants require the BFT franchisees to use BFT's technology, as directed by BFT Australia.  F45 has also proffered evidence that the named defendants pay BFT Australia to distribute the .BFT files to the BFT franchisees.  *See* Dkt. No. 188-1, Exh. 13, at 57:13–58:14.  Those allegations give rise to a factual issue as to whether BFT is responsible for inducing infringement of claims 3, 4, and 6 by the BFT franchisees in this country.  Accordingly, summary judgment will not be granted to BFT on this issue.

## IV.   <u>Conclusion</u>

BFT's motion for summary judgment of invalidity is GRANTED because the asserted claims are all directed to patent-ineligible subject matter under 35 U.S.C. § 101 and are therefore invalid.  BFT's motion for summary judgment of non-infringement is GRANTED IN PART and DENIED IN PART, as indicated above.  A corresponding judgment will be filed contemporaneously with this order.

In an abundance of caution, this order has been filed under seal because the parties' briefs and exhibits regarding the present motions were filed under seal. *See, e.g.*, Dkt. Nos. 182–83, 187–89, 190–91.  Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal.  Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

IT IS SO ORDERED.

SIGNED this 17th day of November, 2022.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE